Thank you. Madam Clerk, please call the first case of the afternoon. 114-2637, the City of Chicago v. José Cortes. Proceed. Good afternoon. Carl Newman on behalf of the City. May it please the Court, the Council. The decision of the Circuit Court should be reversed and the Commission's original determination reinstated because it was not against the manifest weight of the evidence. The Commission had more than sufficient evidence in the record to find, as they did, that Duarte had failed to meet his burden to prove either a diligent but unsuccessful job search or that no stable labor market existed for him. And I'll address those two points in turn. As to the diligent search, the arbitrator and the Commission both focused on the fact that of the 180 contacts that are recorded in his job search diary, that about 80 of those are directed towards companies in roofing, landscaping, flooring, or construction, jobs that were employers who were unlikely to have jobs within Mr. Duarte's restrictions at the sedentary level. And we know, of course, in our reply that there's no response on this point. Now, the 180 contacts that are recorded is 165 that are weirdly over the phone and only 15 that are in person. And the crucial number, we think, is that there are zero applications submitted as a consequence of this search. It begins over two years after he's already reached maximum medical improvement with no explanation given for why he waited that period of time to begin a job search and lasts just slightly less than five months. Clearly, that's enough for the Commission to find that this is not a diligent search. Now, who is Conway? Is he the vocational rehab person? Conway is our expert, our vocational expert. And he directed him to, what, about 15 different leads? As part of an analysis for the second part, the no-sable labor market, he identifies 15 employers who have had recently, currently have, or anticipate having an opening in the future that would hire someone with Duarte's restrictions. Did he claim and apply to any of the ones that Conway had identified? He contacted 10 of the 15 on that list. No applications were submitted, again, throughout the course of this entire search. I'll also note that he did not submit applications to companies that are in that labor market survey, specifically note that they essentially take applications all the time because they have high turnover. I believe one of them specifically says, we are always accepting applications but in person. And, of course, Mr. Duarte only called and did not actually go to that business as far as that was shown. Did the claimant direct his job search at employers that were likely to have positions within his corpus? No, and that's what the commission found, that this was misdirected job search. Similar to we cite the Alexander and the Lovato case, that a job search that is not directed and calculated to find work is not a diligent search. So what other factors made this job search insufficient? Well, the Alexander case and Lovato talk about sufficiency of quality and sufficiency of the length of time. And, again, I'll go back to less than five months. It's a fairly short time. I believe Alexander was a 12-month period and Lovato I actually can't quite recall. But less than five months is a short time to be looking for work, particularly when you're only making phone calls at the rate of, I believe, it averages out to 10 a week, but it's actually almost exactly 10 a week. Some weeks I think it goes up to 12. But 12 phone calls is still not that long, not that many contacts, and five months is not that long. How do you know that? That's what the commission, in resolving this factual question, decided that this was, they referred to it as not a credible job search. That determination is subject to review, to determine if it's against the manifest weight of the evidence. And so they're entitled to some deference on that conclusion. I thought you were speaking from personal experience. Though not in the record. We had a lot of it this morning. Yeah. But let me ask you this. Was there, could the claimant point to there was a language issue, perhaps, that impeded his job search? Well, so first I would say that the fact that he was looking for a job to Spanish-language newspapers, according to his testimony, that's only one factor in terms of the sufficiency of quality. But for reasons that go on. The commission addressed that issue. Specifically, yes. What did they hold? That they did not believe his testimony as to the limitations of his English proficiency was entirely credible. They point to a couple of things. The first is this finding that the arbitrator notes, that during the course of the hearing, Mr. Duarte appears to understand substantially more English because he starts answering questions before they've been translated. I would note that's something that maybe sometimes is difficult to determine from the transcript. But here the third question Mr. Duarte's counsel asks him is not a question. It's an admonition to wait until the translator completes the translation before answering the question. Additionally, in Conway's interview with the claimant, which I know is an in-person interview where a translator was used, first, Mr. Duarte himself tells Conway, I understood about 50% of what you said during the course of this interview. So that's his own self-report. And second, Mr. Conway notes in his report that the claimant appears to have understood many of the questions and, in fact, began answering English-language questions in English without translation. So it's the same thing that the arbitrator noted. They also point to the fact that, as Mr. Duarte admitted on cross-examination, that he was able to work on a job site with English-language supervisors and English-language coworkers. He admits that he received instruction in English on cross-examination, but during his direct says that he only understands perhaps 20% of conversational English. And the commission, sort of in a common-sense conclusion, seems to be saying, if he only understood one of every five words his boss said, he probably wouldn't have been on the job site for that many years. How many years did he work on that job site? Seven years for the city, but he worked 19 years as a union carpenter before that. So that's a total of 27 years. Turning to the no-stable labor market question, we've already addressed a little bit about Conway's opinion, which is the city's expert on this question. But really, it's his burden to prove that there's no stable labor market for him, and the evidence that he's offered is Ms. Entenberg's report. And the commission and the arbitrator essentially say this isn't enough. They point to a variety of reasons to give lesser weight to her opinion. What appears earliest is that she actually never met the claimant and only spoke to him over the phone through a translator. Conway met him personally? Conway met him personally with a translator present. So his observations, for instance, that he seems to be understanding the questions before they're translated and certainly that he's answering them in English before they're translated, were given more weight by the commission. Second, and probably the most crucial defect in Ms. Entenberg's opinion in the commission's eyes, is that she appears to just accept Mr. Duarte's allegations of face value. She takes his allegations that he cannot work and says, assuming these are all true, then I opine that he cannot work. Whereas Mr. Conway had a more thorough analysis of his transferable skills and his work history, including his jobs before Carpenter. Yes, they are remote in time, but in terms of giving weight to a thorough analysis, it seems the commission said Ms. Entenberg sort of glosses over his prior work and Mr. Conway actually analyzes it. I believe, with that, I'd like to reserve the remainder of my time for a vote. You have five minutes. Oh, yes. Thank you, counsel. Thank you. Counsel, you may respond. Good afternoon. My name is Tyler Burbridge. I represent Mr. Duarte in this case. May it please the court and counsel. There are some undisputed facts in this case that are very important that were glossed over completely by the commission, and specifically this man has permanent sedentary restrictions. The only jobs he has ever held is as a farm laborer in Mexico, as a meat packer and cutter, and as a carpenter. What Ms. Entenberg said in her report about the vocational ability of this individual was that the carpenter job has some transferable skills, but none to a man in a sedentary position, and that although she does not specifically address the transferable skills from watching over cows, which is what he testified he did as a farm hand, and as a meat packer and cutter, there is no evidence that within sedentary restrictions, those jobs have any transferable skills for this individual. And what did Conway find? Your Honor, Mr. Conway performed a labor market survey. He met with the petitioner once. He performed a labor market survey, and that was the entire extent of GenX's involvement in this case. He said that there was a stable labor market, but what is important is that he only points out 15 possible jobs for the petitioner. Did the petitioner fill out any applications for any of those jobs? He did, and counsel is correct, there were 10 of them. No, I'm sorry, applications. Yes, he contacted 10 of the employers. I think he admitted because he never completed his application. That's correct, Your Honor. But Ms. Enberg looked at those jobs and said, out of these 15 jobs, 10 of them specifically say in Mr. Conway's report that they aren't hiring. Five of the other five, one requires a high school diploma. This man has a sixth grade education from Mexico. One of them requires good communication skills. At best, he understands 50% of spoken English. That is the most anyone in this case says. About the same rate as Chicago public schools. Now, unfortunately, you're about right. But unfortunately, that does not make people qualify for jobs. And the other three jobs wanted experience in those respective fields, obviously, which this petitioner also did not have. Ms. Enberg's opinion that no stable labor market exists for this petitioner was based upon his age, his occupation, his experience, his lack of transferable skills, and it was reasonably based on the evidence. The commission's decision, on the other hand, which was appropriately reversed by the circuit court, focused completely on whether he could actually understand more than 20% of spoken English. But all they say he can understand is what Conway says, 50%. In no way do they explain how 50% of an English language understanding can lead this man to a stable labor market. He had been his employee for 27 years in positions, correct? You're correct, as a carpenter. And he understood that he could do that. And he said as a meat cutter? He said as a meat cutter. As a meat cutter and packer and as a carpenter, you're correct. There is no evidence anywhere of what English language proficiency is necessary to be a meat cutter or packer. There is no evidence in this case of what English language proficiency is necessary to be a carpenter. Well, the commission finds that he doesn't conduct a diligent job search to shift the burden. Sure. According to counsel, in the record, why did he wait two years after being released from medical care before he even began this job search? Your Honor, this individual was never given help with this job search. The city never offered any assistance. They had one labor market survey performed. They did not have Gen X even work with the petitioner to help him with the job search. As he's testified to, you know, he does not understand the large, at least half of the English language when spoken. He doesn't read or write in English. He doesn't use computers. He doesn't have an e-mail address. It's very difficult for this individual to perform a job search. And he did what he could with his limitations and with his restrictions. Well, the jobs he applied for, he clearly wasn't qualified to perform. He applied for landscaping, roofing, construction fields. All of them were outside of his permanent restrictions. Why would he even apply there? Your Honor, I have no good answer for why he applied for those jobs. Probably to make the numbers on an odd lot. But what I can tell you is that the petitioner can prove he's an odd lot permanent total disability either through the diligence of a successful job search or by proving based on his age, occupation, experience. What was his diligence job search? The jobs he applied for that he wasn't qualified for? Well, Your Honor, even if this court accepts that there wasn't a diligent job search, he has still established his burden of proving he's an odd lot permanent total disability through the opinion of Ms. Entenberg, which is based upon his restrictions, his sedentary permanent restrictions, the fact that he cannot understand more than 50% of the English language, cannot read or write in English. But the problem with that is don't you have an opposing opinion from Conway? And didn't the commission choose specifically Conway over Entenberg? Isn't that what they did? The commission's decision was against the manifest weight of the evidence. But let's establish that first. Didn't they rely on Conway versus Entenberg? They did. And why couldn't they do that? Their decision to rely on Mr. Conway was against the manifest weight of the evidence and that Mr. Conway does not even use the correct restrictions in recommending what jobs he can apply for. And although the commission goes out of its way to criticize this man's job search, it doesn't criticize the fact that Mr. Conway points out 15 jobs, none of which the petitioner is qualified for. So they're saying the petitioner can't find jobs he's qualified for. Well, neither can the respondent's own vocational counselor who does this for a living. And so the fact that he relied on a light-duty job search or light-duty jobs he was looking for when this man is actually sedentary restrictions, so it was the wrong restrictions he even used, and the fact that he couldn't even find any jobs that this man qualified for. Mr. Conway himself says his vocational strengths are having access to downtown Chicago and a driver's license. Are you saying he's not capable of sedentary work? I'm saying that he is capable of sedentary work, but based upon his lack of transferable skills, his sedentary restrictions, and the fact that he understands only at most 50 percent of the English language, those things combined, the manifest weight of the evidence shows that he is not, there is no stable labor market available for him. There is no evidence that supports the commission's leap from saying he answered a few simple questions before they were translated to being able to say this man understands enough English and is proficient enough in the language to have a stable labor market available for him. All right. His medical records indicate he's capable of sedentary work with restrictions on lifting and physical movements. Is that correct? That is correct. Okay. And Conway's labor market survey identified a number of companies that hire employees for light or sedentary work. Is that not also correct? That is correct. And as my learned colleague Justice Hoffman just asked you, so why then didn't he apply for those jobs? Why did he apply for jobs that clearly required a certain level of physical ability that he didn't obviously have? Your Honor, he was not conducting a sophisticated job search because he's a man with a sixth-grade education and no skills or English language skills with which to perform a better job search. He was doing a self-directed job search. And the only way he knew how, through Spanish-language newspapers and making phone calls, he testified that if he drives more than five or ten minutes that his back hurts a lot and that's why he wasn't traveling around at these job searches. While we're on it, didn't the commission find specifically that he gave some conflicting testimony about his driving ability? Your Honor, they essentially said that he said that he couldn't drive more than five, ten minutes. And then said that he drove a little bit longer at some point. The fact that he at one point says he can drive a very short distance, another point says he can drive a little less short of a distance, his medical records show that he has permanent restrictions on his back. His medical records show that he has pain and disability in his back. So the commission was nitpicking and finding that one time versus another time. The records show that he has permanent sedentary restrictions. That is what his doctors are giving him. And the commission ignores that in finding that he can do more than he says he can do. Well, he's doing what his doctors say he can do. And within those restrictions, there is no stable labor market available to this individual. The commission has to ignore his medical restrictions. They have to make the leap that 50% of spoken English places him in a stable labor market. They have to make the leap that a sixth-grade education from Mexico is going to get this guy a job somewhere. And they have to make the leap that Mr. Conway's report showing 15 jobs that this guy cannot do and is not qualified for is evidence of a stable labor market. The fact is that the manifest weight of the evidence in this case is that this man with permanent sedentary restrictions, with language barriers, he cannot, there is no stable labor market available for him. The opinion of Ms. Setenberg was based on those facts. The opinion of Mr. Conway ignored those facts. And the commission made very broad inferences from facts that they found in the transcript in order to find that this man had a stable labor market. Your Honor, the wage differential that was awarded by the commission in this case is based upon Mr. Conway's report, which is based upon 15 jobs that he demonstrably cannot do, this petitioner demonstrably cannot do. There is no basis, there is no factual basis for the commission's decision in this case. The, in conclusion, Your Honor, based upon his age, his previous work experience, his permanent restrictions, and the opinion of Ms. Setenberg, the petitioner has fulfilled his burden of showing that there is no stable labor market available for him, that he's not about permanent total disability. And the respondent failed to show any evidence of a stable labor market. The report from Gen X is not evidence of a stable labor market considering that it also found only jobs that the petitioner was not capable of. And for those reasons, we ask that the decision of the circuit court, which overturned the decision of the commission, be confirmed as the commission's decision was against the manifest way of the evidence. Thank you, Counsel. Thank you. Counsel, you may reply. Just a few quick points, Your Honor. I want to begin with where I believe Justice Hudson's question a few moments ago was that the commission essentially had competing expert testimony and they resolved that in favor of our expert. And since they had that expert testimony to rely on, their decision was almost on its face, not against the manifest way of the evidence. I want to get to just a couple of points about the experts. The first is that Conway's report identifies 15 employers with jobs and it notes the sedentary to light positions available. I think some of them specifically say sedentary positions are available. Some of them say light positions are available. Sedentary positions are available on occasion, et cetera. No, they're specified. Specified, yes, in the report. I also want to point out that Ms. Entenberg, in one of her later letters actually, she responds essentially to Conway's expert report where he's identified these 15 jobs. Counsel was discussing that she talked about some of them didn't have current openings, some of them preferred experience, et cetera. I'm looking at her September 28, 2010 letter, and she essentially says, well, actually there's this assembly position that it seems like he could maybe do. Did he apply for that? He contacted six of seven assembly jobs, but no applications were submitted again. And I just note that because she says, well, there is this assembly job, and that's actually almost half of the jobs. So there's no applications, I suppose. No applications, Your Honor, yes. And just finally, a last note about this driving ability question. I just want to say that actually the record, as I read it, he actually was asked specifically, are you able to drive, and answered no. And then just a few pages later. Was this at the arbitration hearing? This is, yes, at the arbitration hearing. The question was what, though? He was asked, quote, are you able to drive, answer no. And then a few pages later, in the middle of one of his answers, he says sometimes when I drive just a little bit, and then goes on from there. And I want to highlight it because the driving ability, whatever it means for his ability to find a job or to look further, whatever other conclusions can be drawn, it's a crucial point for his credibility, the credibility of his testimony. The context in which this arises is he's answering leading questions from his own attorney and contradicts himself some four pages apart from the transcript. And I think the commission was right to attach a lot of significance to that contradiction. And with that. Does that go to his diminished language ability? I. I mean, you're making an inference. Well, so he does. Well, so there's also, I would say, I don't know that I would draw a conclusion. I don't believe the commissioner or the arbitrator did, that that particular line of testimony goes to his English proficiency. I know that there's also a third reference to the driving because, of course, the city attorney picks up on this contradiction during his direct and asks him on cross-examination about it. And then I think he says that he can't drive for more than five or ten minutes. He also says at one point elsewhere in the record, although I can't quite recall, I believe it's in Conway's report, that the problem driving is when he uses the pedals. So he seems to suggest it's when he's actually driving, not just when he's in the car. And with that, we would ask that you reverse the circuit court and reinstate the commission's original decision. Thank you, counsel. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement that this position shall issue.